## Case No. 5,557.

### GOODYEAR et al. v. BEVERLY RUBBER CO.

[1 Cliff. 348.] [1]

Circuit Court, D. Massachusetts.  Oct. Term, 1859.

PATENTS—CONSTRUCTION — VULCANIZED RUBBER— SALE OF PATENTED MACHINE—SALE OF PORTION OF FRANCHISE—MONOPOLY.

1. The patent issued to Charles Goodyear, June 15, 1844. for improvement in India-rubber fabrics, reissued December 25, 1849, and extended for seven years, June 15, 1858, was for the product known as vulcanized rubber, as well as for the process by which it was produced.

2. When the patentee sells the right to make, use, and vend the invention in a particular place. the purchaser buys a portion of the franchise which the patent confers; but the purchase of a patented implement or machine for use in the ordinary pursuits of life stands on a different ground.

[Cited in American Cotton Tie Co. v. Simmons, Case No. 293; Adams v. Burks, Id. 50; Hawley v. Mitchell, Id. 6,250; Holiday v. Mattheson, 24 Fed. 186; Morgan Envelope Co. v. Albany Perforated W. Paper Co., 152 U. S. 425, 14 Sup. Ct. 630.]

3. By virtue of the contract of sale and the unconditional delivery of a patented article, it passes outside of the monopoly, and is no longer under the peculiar protection granted to patented rights.

[Cited in Adams v. Burks. Case No. 49; Hill v. Whitcomb, Id. 6,502; Hawley v. Mitchell, Id. 6,250.]

4. When the patentee of certain processes and the product thereof, for a valuable consideration, sold the patented article, both the manufactured article and the materials of which it was composed passed to the purchaser, discharged of the peculiar privileges secured by the patent; and the purchaser may use the material in the manufacture of other articles not themselves protected by a patent.

5. And this is the case, although the patented article was bought of the patentee's licensee, who was restricted by the license to a use of the patented product different from that to which it was devoted by the purchaser.

[Cited in American Cotton Tie Supply Co. v. Bullard, Case No. 294.]

Bill in equity [by Charles Goodyear and others] to recover damages for the infringement of a patent right. Charles Goodyear was the inventor and patentee of an improved process for the manufacture of India-rubber, and the other complainants were grantees and licensees under him, of the exclusive right of making, using, and vending to others to be used, the said improvement for making clothing. Letters-patent [No. 3,633] were granted to the first-named complainant on the 15th of June, 1844, for a new and useful improvement in rubber fabrics. On the 25th of December, 1849, a reissue [No. 156] was granted him for fourteen years, and on the 15th of June, 1858, a renewal for seven years. The rights of the licensees to make various articles of rubber, and the exclusive right to make clothing under the patent, existed before the extension; and the same were continued to them by subsequent agreements, which were in force at the time of the suit. Articles manufactured from the material prepared according to the patented process were denominated vulcanized rubber goods, and it was alleged that the term applied to the goods was understood by the respondents, and all persons engaged in the business, to mean the goods made of a compound of India-rubber, in the original composition of which sulphur is present in any form or degree, and where the compound in that state has been subjected to the action of artificial heat, so as to produce the chemical or other changes described in their patents. To show the character of the infringement, it was further alleged that the respondents, in making their goods, had used a compound which at some time before the manufacture had been subjected to a treatment substantially similar to that of the complainants, and the same in its effects. The above embraces the substance of the bill, which prayed for an account, damages, and an injunction. In effect the answer denied that the papers annexed to the bill of complaint were, as they purported to be, true copies of Charles Goodyear's original and reissued patents, or that the reissued patent was ever extended as alleged. Objection was also made to the maintenance of the suit by the last-named complainants, as they were not a legally existing corporation; and they were required to prove the existence of the agreements under which they claimed rights in the patent. Concerning the process it was admitted that

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

the term "vulcanized rubber" was known and used as meaning India-rubber, manufactured according to the patent of Charles Goodyear, by subjecting it to a high degree of heat after it has been combined with certain metallic substances; but it was denied that all rubber goods which have sulphur in them, or have been subjected to any degree of heat, are vulcanized rubber. It was insisted that vulcanized rubber could be devulcanized and thus cease to be vulcanized, as iron can be changed to steel, and steel converted back into iron, and cease to be steel. The respondents claimed to manufacture the rubber for the manufacture of rubber goods by a different process from that of the complainants, and described their own method substantially as follows: They bought up the old worn-out shoes made by the first-named complainant and his assignees, and deprived them of those peculiar properties which constitute vulcanized rubber. To accomplish this, they ground up the shoes until they were reduced to a finely pulverized substance, and boiled it in hot water or steamed it for about forty-eight hours, to devulcanize the goods, destroy the sulphur and other metallic substances, and as far as possible expel them from the material. After the boiling process the substance became sticky and soft, so that it could be formed into a sheet or rolled out, like vulcanized rubber; but all the properties of vulcanized rubber were removed by this treatment. Resins, coal-tar, and gum-shellac were then incorporated with the material to give strength and perfection to the fabric; after which, spread upon cloth and made into the various intended articles, it was dried in the sun or in slightly heated rooms. For this process the respondents, as assignees of Hiram L. Hall, had three patents. The answer further set up as a proof that goods manufactured by the respondent's process were not vulcanized rubber goods; that they were not prevented from liability to decompose by the action of the essential oils, or from animal perspiration. As a further defence, the answer set forth that all the rubber used by respondents had once been vulcanized by the license and permission of the first-named complainant, had once been publicly sold by his consent; and that therefore he had once been paid a price satisfactory to him, and that he could not therefore forbid or prevent the use of it by lawful purchasers for a lawful purpose.

B. R. Curtis and E. Merwin, for complainants.

It was shown by the evidence that the goods of the respondents retain more or less of the important qualities of vulcanized rubber, and that their value is due to that. But assuming that the effect of their process is to devulcanize vulcanized India-rubber, and that their goods are no longer vulcanized, then the respondents are still liable, inasmuch as they unlawfully employ in their manufacture vulcanized rubber, the product of Goodyear, and secured to him by his patent. Vulcanized rubber being covered by Goodyear's patent, no one can use it without his license. No express license is pretended. Then, if respondents have any implied license, they must derive it from the persons from whom they procured the rubber. But if the licensees from whom respondents obtained their rubber had no authority to employ the same in the manufacture of clothing, then respondents had no such right. Now the licensees of Goodyear are allowed to use vulcanized rubber for the manufacture of shoes only, and, not being allowed to use the rubber for any other purpose themselves, can confer no other right upon any one else. Goodyear never directly granted a general use of his vulcanized rubber, and nothing passed by implication, except such things as were incident to the subject of the grant and necessary to its enjoyment. Broom, Leg. Max. (3d Ed.) 310; Stevens v. Gladding, 17 How. [58 U. S.] 447–452, 453. See Wilson v. Simpson, 9 How. [50 U. S.] 109. The tariff which Goodyear received on the rubber shoes was adjusted in reference to the use of his product in the manufacture of that article, and he has been paid for nothing more.

Caleb Cushing and H. F. Durant, for respondents.

The substance of the defence is sufficiently indicated in the statement of the facts and pleadings.

CLIFFORD, Circuit Justice. Mere formal objections to the right of the complainants to maintain the suit will not be considered at the present time, for the reason that all those objections, even if well taken, may be obviated by additional proofs; and if it should appear that the complainants have a meritorious cause of action upon the merits, it would still be competent for the court to allow such proofs to be introduced. Two principal questions are presented on the merits, but in the view taken of the case it will only be necessary to examine one of them to determine the controversy. Assuming that the suit is well brought, and that the patent of the first-named complainant is for the product, as well as for the process of manufacturing it, still the respondents insist that they do not infringe the rights of the complainants; because, as they contend, they do not use that process in the manufacture of their goods, and inasmuch as they purchase the product in the market either from the patentee or his licensees, or those rightfully owning and possessing it under them, they have the right to use it as they please for any lawful purpose. In the second place, they insist that the process used by them has the effect to devulcanize the material which they use in the manufacture of their goods, depriving it of all the peculiar qualities

and properties imparted to it by the process of the first-named complainant, and that the goods which they manufacture and sell are not vulcanized India-rubber goods, within the intent and meaning of the complainants' patent. By the pleadings and evidence it conclusively appears, that the respondents purchase the old worn-out shoes made and sold in the market by the first-named complainant, or his assignees, and use that material for the manufacture of their goods. Their process of preparing and using the material is stated by several witnesses of great experience and intelligence substantially as follows. They purchase the shoes made of vulcanized India-rubber, according to the process of the first-named complainant, grind it between steam-heated rollers into a coarse powder, then put the powder into what are called "reclaimers," exposing it to a high degree of steam, say from seventy to one hundred and fifty pounds' pressure to the inch. When the mixture comes from the reclaimers it is pasty and tenacious, and is then passed through steam-heated rollers, adding coal-tar, litharge, and resin with lampblack during the process of rolling. Those substances are incorporated with the material while the steamed rubber is passing the rollers, which effects a combination of the whole, and produces, as the witnesses say, a thick pasty sheet of modified rubber, fit and prepared to be laid on cloth. That sheet of modified rubber is then put into the calenders, where the cloth is passing over a steam-heated roller, thereby receiving a thin coating or sheet of the composition, which is pressed on smooth by the roller of the calender. To complete the process, the cloth is then dried in the sun, or in rooms heated to a low degree of heat, as stated in the answer. Without entering more into particulars, it will be sufficient to say that the evidence, in the judgment of this court, shows conclusively that the respondents do not use the process of the complainants. They do not use sulphur or its equivalent in any form, and their process of drying the goods is essentially different, and is accomplished by a much lower degree of heat. That proposition is sustained as well by the results attained by the process as by the means employed to produce those results. Complainant's process is designed and has the effect to bring the composition or material to the state in which it was when the shoes were made and sold in the market. Respondents purchase the material in that state, and their process is designed and has the effect to destroy the foreign material connected with the rubber, such as cotton or wool, and to partially melt and very much to soften the rubber as manufactured by the complainants, thereby modifying and changing its state, at least temporarily, so that it can be again used for a similar purpose. These considerations lead necessarily to the conclusion that the respondents do not use the process of the complainants; but the whole evidence shows that they do use the product produced by the proc-

ess, and in point of fact that they cannot use any other. No doubt is entertained that the patent of the first-named complainant is for the product as well as for the process by which it is manufactured. Of itself the patent is sufficient prima facie evidence that the patentee was the original and first inventor of the thing patented, and that the same was new and useful; from which it follows that the burden of proof lies on the respondents to show a prior invention, or to disprove its novelty and usefulness. They have not exhibited any such proof, and consequently cannot prevail on that ground. Assuming that their process does not produce a new product, they are therefore without defence in this suit; unless, under the circumstances of the case, they have a right to use the product manufactured by the complainants. That question is one of considerable importance, and certainly is not unattended with difficulty in its solution. Inventors, as in this case, have not only the exclusive right to manufacture the product according to their process, but they also have the exclusive right to use and sell the manufactured article. Those privileges constitute the rights secured to them by their letters-patent. Another person consequently cannot make vulcanized India-rubber for the purpose of manufacturing shoes and selling the manufactured article without the grant or license of the patentee or his assigns. Patentees may grant an interest in the patent, or they may license another to manufacture the product produced by their process, and authorize him to sell the same in the market. Whether the inventor in any given case has a patent for the article manufactured, or only for the product or the material of which it is composed, the unconditional sale of the manufactured article carries with it the absolute dominion over the material as well as over the manufactured article. Having manufactured the material and sold it for a satisfactory compensation, whether as material or in the form of a manufactured article, the patentee, so far as that quantity of the product of his invention is concerned, has enjoyed all the rights secured to him by his letters-patent; and the manufactured article, and the material of which it is composed, go to the purchaser for a valuable consideration, discharged of all the rights of the patentee previously attached to it, or impressed upon it, by the act of congress under which the patent was granted. Few decided cases are to be found bearing on this question, and none perhaps where it has been directly determined. Those which come nearest to the point in the federal courts are Bloomer v. McQuewan, 14 How. [55 U. S.] 549, and Wilson v. Rosseau, 4 How. [45 U. S.] 646, which very clearly and satisfactorily recognize the true distinction between the grant of the right to make and vend a patented machine, and the grant of the right to use it. In the case first named, Taney, Ch. J., says the franchise which the patent grants consists altogether in the right to exclude every

one from making, using, or vending the thing patented without the permission of the patentee, adding in effect that this right of excluding others from exercising those privileges is all he obtains by the patent. When the patentee sells the exclusive privilege of making and vending it for use in a particular place, the purchaser buys a portion of the franchise which the patent confers. He obtains a share in the monopoly which is derived from, and exercised under, the protection of the United States. Unless otherwise provided in the contract, the interest which the purchaser thus acquires terminates at the time limited for the continuance of the patent; and if holding merely as an assignee, he has no just claim to share in a further monopoly subsequently acquired by the patentee. But the purchaser of the machine or implement, for the purpose of using it in the ordinary pursuits of life, stands on a different ground. In using it he exercises no rights created by the act of congress, nor does he derive title to it by virtue of the franchise or exclusive privilege granted to the patentee. Whether the inventor had a patent or not, he might lawfully sell it to him, if no other patentee stood in the way. Accordingly, it has been repeatedly held by the supreme court, that a party who had purchased a patented machine, and was in the use of it during the original term of the patent, might continue to use the machine during the extended term. Bloomer v. McQuewan, 14 How. [55 U. S.] 549; Wilson v. Rosseau, 4 How. [45 U. S.] 646. That rule, as was held in Chaffee v. Boston Belting Co. [22 How. (63 U. S.) 217], decided at the last term of the supreme court, rests upon the doctrine as stated in the preceding case, that the purchaser, in using the machine under such circumstances, exercises no rights created by the patent act, nor does he derive title to it by virtue of the franchise or exclusive privileges granted to the patentee. Both of those cases affirm the rule, that when the patented machine rightfully passes to the hands of the purchaser, from the patentee, or from any other person by him authorized to convey it, the machine is no longer within the limits of the monopoly. By virtue of the contract of sale, and the unconditional delivery of the manufactured article, it passes outside of the monopoly, and is no longer under the peculiar protection granted to patented rights. Whenever a valid sale of the patented article is thus made, it then becomes the private property of the purchaser, and is no longer protected by the laws of the United States, but by the laws of the state in which it is situated. From this rule, which is believed to be a sound one, it follows that, if a purchaser acquires an absolute, unconditional title to that which is the subject of a patent, he may continue to use it until it is worn out, or he may repair it or improve upon it as he pleases, in the same manner as if dealing with any other kind of property. Suppose it to be an implement or machine, he may devise it or sell it, and if it be composed of various parts he may break it up and use the materials for any other lawful purpose. Second purchasers acquire the same rights as the seller had, and may do with the article or its materials whatever the first purchaser could have lawfully done if he had not parted with the title. Some attempt was made at the argument to distinguish this case, and take it out of the operation of this general rule, on the ground that the patentee had never granted to any one the right to use his process to manufacture the patented product and sell it in the market, without restricting and specifying the object to which it was to be applied. To one he granted the right to use the process for the purpose of making shoes, and to another the exclusive right to use it for the purpose of making clothing. Neither had the right to use the process for the purpose granted to the other; and the argument proceeds upon the ground that the purchaser of the manufactured article in either case cannot apply the material of which the manufactured article is composed to any object or purpose other than the one to which the manufacturer and original seller was authorized to apply it. Beyond question, the grantee, assignee, or licensee of the right to make and vend the patented product is bound by his contract and cannot exceed it. His contract, however, in the case under consideration, fully authorized him to manufacture the material of which the shoes are composed, and to sell the shoes in the market. When he sold the shoes and received the consideration for the sale, the royalty for that quantity of the manufactured product was paid, and so much of the product went to the purchaser discharged of the peculiar privileges secured by the patent. Absolute dominion over the material of which the shoes are manufactured passes to the purchaser when the sale is made, and he is not obliged to keep them as waste articles, or throw them away when they cease to be of value as shoes, but may use the material for any other lawful purpose to which it can be applied. As bona fide purchasers of the shoes, therefore, the respondents may use the material of which they are composed to make clothing or any other article not itself protected by a patent. Having come to this conclusion, it is unnecessary to consider the remaining proposition assumed by the respondents. The bill of complaint is therefore dismissed with costs.

[For other cases involving this patent, see note to Goodyear v. Central R. Co., Case No. 5,563.]