### DAIMLER MFG. CO. et al. v. CONKLIN.

(Circuit Court, S. D. New York. April 30, 1908.)

PATENTS—INFRINGEMENT—USE OF ARTICLES PURCHASED IN FOREIGN COUNTRY.
 A citizen of the United States, who, being in a foreign country, there purchases, solely for his personal use, an article protected in the United States by a patent granted to an assignee of the inventor, which the maker and seller in the foreign country had the right from the inventor to there make and sell, does not become an infringer of the United States patent by bringing such article home with him and using it here personally, and not for commercial purposes or profit.

In Equity. Suit to restrain alleged infringement of certain United States letters patent and for an accounting.

See 145 Fed. 955.

Taylor & Anderson (Howard Taylor and Francis H. Kinnicutt, of counsel), for complainants.

Henry M. Earle (John Ingle, Jr., of counsel), for defendant,

RAY, District Judge. Wilhelm A. Maybach, of Cannstadt, Germany, is the original and first inventor of the devices named and described in the following United States letters patent, issued, however, to the Daimler Manufacturing Company, of New York, N. Y., assignee of said Maybach for the United States, viz.: No. 686,100, dated November 5, 1901, for "lock for gear-shifting devices"; No. 688,108, dated December 3, 1901, for "brake for motor vehicles"; No. 709,416, dated September 16, 1902, for "cooling and condensing apparatus." Said Maybach is also the inventor of and patentee named in a patent for improvements in "motor vehicle," No. 703,- 436, dated July 1, 1902, which relates more especially to an arrangement for sucking air through the cooling apparatus for the motor. July 1, 1902, Maybach duly assigned this last patent to the complainant company. March 1, 1905, as of January 1, 1905, the complainant company and the complainant Charles Lehman-Charley entered into a license agreement which contained the following:

"Whereas, the Daimler Manufacturing Company (hereinafter called the 'American Company') is possessed of various United States patent rights covering inventions and devices which are also employed in Germany by the Daimler·Motorem Gesellschaft, of Cannstadt (hereinafter called the 'German Company') in the manufacture of automobiles and launch motors, and especially in making their Mercedes automobile; and

"Whereas, Charley is in the business of selling automobiles and launch motors made by the German Company to customers who use the same in the United States and Canada, and desires to take from the Daimler Manufacturing Company a license in behalf of himself and his customers, so that the bringing of the German Company's products into the United States shall not be in defiance of, but, on the contrary, in respect of, the rights of the American Company:

"Now, therefore, it is agreed between the parties hereto as follows:

"(1) The American Company hereby licenses Charley and any and all persons to whom he may have sold or to whom he may sell automobiles, launch motors, or launches, manufactured by the German Company, to import, use, and vend the same in the United States of America and Canada without let or hindrance at any time from the American Company: Provided, however, that the evidence of the license shall be in the form of a license plate with suitable words thereon. This license plate Charley shall be privileged to place on such of the machines aforesaid as he may desire, and the license hereby granted shall only inure to the benefit of such of his customers, or their successors in interest, as he may provide with the license plate.

"(2) The American Company further agrees that, so long as the above license to Charley and his customers and for the benefit of Charley and his customers is in force, it will grant no other license to anybody either to import, or to use, or to vend automobiles, launch motors, or launches of the German Company in either the United States or Canada, or any part of the United States or Canada.

"(3) The American Company further agrees that so long as the license above mentioned is in force it will, upon demand by Charley or his attorney, authorize said attorney to institute suit or suits in its behalf, either alone or in conjunction with other complainants, against anybody who is not respect-

ing the patent rights of the American Company or the exclusive license hereby granted to Charley, but at Charley's expense.

"In consideration of the above:

"(4) Charley agrees, by way of a license fee, to make the following cash payments to the American Company for every one of the machines above mentioned sold by him and imported into the United States or Canada and arriving after the date of this agreement (no matter when the same may have been sold), to wit: One hundred dollars ($100) for each automobile up to and including sixty (60) horse power; two dollars ($2) per horse power for each automobile exceeding sixty (60) horse power; and two dollars ($2) per horse power for any launch motors or launches.

"(5) The fact that the license plate is affixed to a machine shall be conclusive evidence upon its importation that a license fee is due thereon. A license fee shall also be due on such machines, when imported, not provided with a license plate, as Charley may have sold in Europe to residents of the United States or Canada, unless Charley shall at the time of the sale have given to the purchaser a receipt wherein it is stated that such car is for use only in Europe, and in case it is taken into the United States or Canada the owner or importer shall pay the license fee therefor demanded by the American Daimler Company, or be considered an infringer, and that then and in such case the said Charley shall be personally relieved from the payment of such license fee.

"(6) Statements of the license plates issued by Charley are to be rendered by him each month to the American Daimler Company. Charley pays forthwith upon the signing of this contract seven thousand dollars ($7,000) down in advance on account of such license fees, the receipt of which the American Company hereby acknowledges. Charley agrees to make a like payment of $7,000 in advance on account on January 1, 1906, and again on January 1, 1907, and further agrees that the American Company shall at all times be kept in funds at least $2,000 in advance on account of such license fees. The American Company is, however, to notify Charley when the margin should be made good. The obligation to pay $2,000 in advance on account of license fees shall not continue after the advance payment of January 1, 1907, unless Charley shall make lump sales showing that such advance payment will be used up before the end of the year in license fees.

"(7) Charley will not enter into any other license arrangements than the above respecting any patents or alleged patents covering or claimed as covering the German Company's machines sold by him or any parts thereof, and the American Company will defend Charley in any suits which may be or which may have been brought against him or any of his customers on account of his failure to take out any such other license, which he may wish to defend, such defense, however, to be at Charley's expense.

"(8) The above license and agreement on the part of the American Company is to continue so long as Charley makes the payments and renders the accounts aforesaid, which he agrees to do. The agreement is in any event to expire December 31, 1907, but upon any expiration of the agreement the license shall continue for the benefit of Charley or any of his customers or their vendees, so far as the automobiles, launch motors or launches may have been already imported into this country."

It seems that this German Company—Daimler Motorem Gesellschaft—uses these patented devices rightfully in the manufacture and sale of automobiles in Europe; all the devices being in a car and conjointly used therein. The defendant, Roland R. Conklin, a resident and citizen of the state of New York, being temporarily in Europe on a trip for travel and recreation, on or about the 1st day of July, 1905, in good faith, and for his private and personal use in travel in Europe and elsewhere, wherever he might go, purchased of the German Company, through Schrader & Co., of Paris, France, a Mercedes automobile manufactured by this German Company and containing these patented devices. There was no patent or license notice or restric-

tion on the car or connected with its purchase, and he became the sole and exclusive owner of the car. Defendant had no notice or knowledge when he purchased that the automobile contained any patented device. On the completion of his European trip and on his return to the United States he brought the car with him, and has been personally using it here in going to and from his home since. This is the alleged infringement, and these the acts complained of. After defendant's return to the United States, and on his commencing to use the car in question here, demand was made upon him for the payment of $300 as a condition of his right to use same here. He declined to pay. It is assumed by the complainant that, if these devices were patented in Germany, the German Company had the right to make and sell there, but that the purchaser and user there of a car containing the patented devices would be protected there only, and that on bringing the car into the United States and using it here he would become an infringer of, the United States letters patent. Maybach, the inventor, it is said by defendant, took out patents for his invention in Germany, and the maker of this car was making and selling by license or permission of the German patentee.

I find no evidence of a German patent; but it is evident that the German Company was making and selling automobiles containing the devices in question by permission of the inventor, Maybach. There is no evidence of any restriction on the right to make, use, and sell machines containing these devices in Germany or France. Maybach, the inventor, is a stockholder in the complainant corporation and also in the said German corporation, Daimler Motorem Gesellschaft, and until March 31, 1907, was a director in both corporations. It follows that the German Company had the right to make and sell and use, and confer the right to use, anywhere outside of the United States. The question presented is, therefore, does a citizen of the United States, who, being in a foreign country, there purchases for his personal use, solely, an article protected in the United States by a patent there granted to the assignee of the inventor, and which the maker and seller in the foreign country had the right from the inventor to make and sell, and which the purchaser had the right to purchase and use so long as he remained abroad, become an infringer of the United States letters patent, if on coming home he brings such article with him and personally uses it here? He has not gone or sent abroad and purchased it, and imported it for use, or for sale, or for profit. He is not selling or offering for sale. In no sense is he using it for commercial purposes or profit. Patents are granted for ornaments, for articles of wearing apparel, etc. If A. invents a shoe buckle, or a suspender buckle, and sells the exclusive right in the invention to B. for the United States, B. taking out a patent in the United States, A. retaining in himself the exclusive right in the invention for the rest of the world, and he makes and sells it in England and other countries, and C., an Englishman, purchases in England a pair of shoes or suspenders containing the invention and wears them into the United States, does he become an infringer of the United States patent and liable to an injunction and suit for damages? And does it make any

difference that such a purchaser is an American citizen temporarily abroad?

It seems to me that B., in so purchasing the invention for the United States and taking the United States patent, does so with the understanding and limitation that A., the inventor, retains the right to make, use, and sell in the rest of the world, and that if he exercises such right the mere purchaser abroad for personal use abroad and elsewhere may personally use the article in the United States or elsewhere, confining it to his personal use and personal convenience. Should he purchase and bring to the United States for commercial purposes, or for manufacturing purposes, or for profit, such an article, it may well be the law that he is an infringer; but it seems to me that the purchaser is not compelled to discard his clothing, personal ornaments, umbrella, or other articles of personal use, rightfully purchased abroad for such uses abroad, free from any patent right in the country where made and sold, on returning home. It is true that the patent for the United States grants the patentee the exclusive right to make, use, and sell in the United States and its territories; but it is also true that the inventor, in the case stated, retains the right to make, use, and sell in the rest of the world. If a citizen of the United States purchases here for personal use an automobile containing the patented devices, cannot he take it to Europe, and, without infringing an English patent to the same inventor of the device, personally use it there? So of other articles purchased for personal use and convenience. I think this case is covered in principle by the following cases: Adams v. Burke, 17 Wall. (U. S.) 453, 21 L. Ed. 700; Hobbie v. Jennison, 149 U. S. 355, 13 Sup. Ct. 879, 37 L. Ed. 766; Boesch v. Graff, 133 U. S. 697, 702, 703, 10 Sup. Ct. 378, 33 L. Ed. 787; Birdsell v. Shaliol, 112 U. S. 485, 487, 488, 5 Sup. Ct. 244, 28 L. Ed. 768; Wade v. Metcalf, 129 U. S. 202, 9 Sup. Ct. 271, 32 L. Ed. 661; Dickerson v. Matheson, 57 Fed. 524, 527, 6 C. C. A. 466; Paper Bag Machine Cases, 105 U. S. 766, 770, 771, 26 L. Ed. 959.

In Wade v. Metcalf, 129 U. S. 202, 9 Sup. Ct. 271, 32 L. Ed. 661, the syllabus is as follows:

"Under Rev. St. § 4899 (U. S. Comp. St. 1901, p. 3387), a specific patentable machine, constructed with the knowledge and consent of the inventor, before his application for a patent, is set free from the monopoly of the patent in the hands of every one; and therefore, if constructed with the inventor's knowledge and consent, before his application for a patent, by a partnership of which he is a member, it may be used by his copartners after the dissolution of the partnership, although the agreement of dissolution provides that nothing therein contained shall operate as an assent to such use, or shall lessen or impair any rights which they may have to such use."

Mr. Justice Gray, in giving the opinion, said:

"This section clearly defines four classes of persons who shall have the right to use, and to vend to others to be used, a specific patentable machine: First. Every person 'who purchases of the inventor' the machine before his application for a patent. Second. Every person who 'with his knowledge and consent constructs' the machine before the application. Third. Every person 'who sells' a machine 'so constructed'; that is to say, which has been constructed with the knowledge and consent of the inventor by another person. Fourth. Every person who 'uses one so constructed'; that is to say, constructed with the inventor's knowledge and consent by another person."

It is evident that, the inventor having taken part in making and selling the Mercedes machine in question, there being no evidence of a prior German or French patent, same was freed from any claim the inventor could make. It would seem equally clear that, inasmuch as the inventor and German Company had a clear right to make and sell the machines in Germany and France, the purchaser became the absolute owner and entitled to use same anywhere, unless the prior issue of the United States patent to the complainant company as assignee of the inventor acts to prohibit such purchaser and owner from bringing his machine into the United States and using it here. In Adams v. Burke, 17 Wall. 453, 456, 21 L. Ed. 700, the Supreme Court laid down the broad proposition or doctrine that:

"(1) Where a patentee has assigned his right to manufacture, sell, and use within a limited district an instrument, machine, or other manufactured product, a purchaser of such instrument or machine, when rightfully bought within the prescribed limits, acquires by such purchase the right to use it anywhere, without reference to other assignments of territorial rights by the same patentee. (2) The right to the use of such machines or instruments stands on a different ground from the right to make and sell them, and inheres in the nature of a contract of purchase, which carries no implied limitation of the right of use within a given locality."

This case has been frequently commented on and approved in the Supreme Court, and in no way limited.

In Hobbie v. Jennison, 149 U. S. 355, 360, 364, 13 Sup. Ct. 879, 37 L. Ed. 766, the court cited the cases and held:

"An assignee for Michigan of a patent for an improvement in pipes, made, sold, and delivered in Michigan pipes made according to the patent, knowing that they were to be laid in the streets of a city in Connecticut, a territory the right for which the seller did not own under the patent, and they were laid in that city. Held, under Adams v. Burke, 17 Wall. 453, 21 L. Ed. 700, that the seller was not liable, in an action for infringement, to the owner of the patent for Connecticut."

The court said among other things:

"But we are of opinion that the case of Adams v. Burke cannot be so limited, that the sale was a complete one at Bay City, and that neither the actual use of the pipes in Connecticut, nor a knowledge on the part of the defendant that they were intended to be used there, can make him liable."

Clearly the sole owner of the patent for Michigan had no right to sell in Connecticut. The sole owner of the patent for Connecticut could have enjoined any sales there by any person except his licensees or agents; but, notwithstanding his sole ownership of such patent for that state, he could not enjoin one who had rightfully purchased in Michigan, even with intent to use in Connecticut. Here the purchaser in Michigan paid tribute under the Michigan assignment of the patent to the assignee for that territory; but by the very terms of that assignment such assignee had no right to sell for either sale or use in Connecticut. That exclusive right had been granted to the assignee for the territory of Connecticut. The decision of the case rested on the broader principle enunciated in Adams v. Burke, supra, and restated fully and emphatically in Boesch v. Graff, supra, and the court said (page 361 of 149 U. S., page 880 of 13 Sup. Ct. [37 L. Ed. 766]):

"The Circuit Court further said that there was no evidence in Adams v. Burke that the sale was made under the belief on the part of the seller

that the article was to be used within his territory, and that the case was authority for the broad proposition that the sale of a patented article by an assignee within his territory carries the right to use it everywhere, notwithstanding the knowledge of both parties that a use outside of the territory is intended."

In Boesch v. Graff, 133 U. S. 697, 702, 703, 10 Sup. Ct. 378, 33 L. Ed. 787, the subject is discussed, and the court held:

"When an invention patented in a foreign country is also patented in the United States, articles containing it cannot be imported into the United States from the foreign country and sold here without the license or consent of the owner of the United States patent, although purchased in the foreign country from a person authorized to sell them."

And in the opinion it was said, quoting and approving Bloomer v. McQuewan, 14 How. 539, 549, 14 L. Ed. 532:

"But the purchaser of the implement or machine for the purpose of using it in the ordinary pursuits of life stands on different ground. In using it he exercises no rights created by the act of Congress, nor does he derive title to it by virtue of the franchise or exclusive privilege granted to the patentee. The inventor might lawfully sell it to him, whether he had a patent or not, if no other patentee stood in the way; and when the machine passes to the hands of the purchaser it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress. In Adams v. Burke, 17 Wall. 453, 21 L. Ed. 700, it was held that 'where a patentee has assigned his right to manufacture, sell, and use within a limited district an instrument, machine, or other manufactured product, a purchaser of such instrument or machine, when rightfully bought within the prescribed limits, acquires by such purchase the right to use it anywhere, without reference to other assignments of territorial rights by the same patentee,' and that 'the right to the use of such machines or instruments stands on a different ground from the right to make and sell them, and inheres in the nature of a contract of purchase, which carries no implied limitation to the right of use within a given locality.' "

It seems to me clear, and I will not quote further from the cases, that the law is settled that one who purchases a patented device or machine, or one containing patented devices, for use from the inventor before he takes a patent in the territory where it is made and sold, or who purchases same from one having the right to sell it, such right being derived from the patentee, has the right to use it anywhere; that "the right to the use of such machines or instruments stands on a different ground from the right to make and sell them, and inheres in the nature of a contract of purchase, which carries no implied limitation to the right of use within a given locality." This was expressly stated by the court in a case where it was holding expressly that one who purchases articles abroad, made and sold under a foreign patent, has no right to bring them to the United States and sell them here as against a United States patent for the same invention. The court was expressly and intentionally drawing this distinction between the rights of the seller of such machines in the United States and those of the mere user here who has purchased abroad. When the inventor, Maybach, acting within his reserved rights, made these machines in Germany and France and sold them there, it is presumed he added such sum as would compensate him for the use of his invention by the purchaser and user of a particular machine. Such purchaser and user has paid his tribute, if exacted, to the inven-

tion, to one who had the right to exact and demand it. The purchaser of the invention and patentee for the United States understood this, and that it would be done. It seems to me clear that, within the decided cases, the complainants have failed to show infringement by defendant.

There will be a decree dismissing the bill, with costs.